F I L E D
Clerk
District Court

JUN 02 2020

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

UNITED STATES OF AMERICA,

       Plaintiff,

       vs.

EFRAIM ATALIG and EVELYN ATALIG,

       Defendants.

Case No. 1:18-cr-00013

**DECISION AND ORDER DENYING**
**DEFENDANTS' MOTION FOR**
**SANCTIONS**

       Defendants Efraim Atalig and Evelyn Atalig have filed a motion to sanction the United States (ECF No. 177). In their motion, the Ataligs[1] accuse an FBI special agent of ex parte communications with their expert witness and attempted witness tampering. The government filed an opposition (ECF No. 181), and the Ataligs filed a reply (ECF No. 186). To establish a factual record of the events underlying this motion, the Court held an evidentiary hearing on May 20, 2020. (Minute Entry, ECF No. 214.) Having now considered both the evidence and the parties' legal arguments, the Court denies the Ataligs' motion for the following reasons.

## I.      Procedural Background

       Efraim Atalig is the incumbent mayor of Rota, one of the three principal islands in the Commonwealth of the Northern Mariana Islands (CNMI). Evelyn Atalig is a public servant in the Women's Affairs Office on Rota. On November 28, 2018, a federal grand jury indicted the Ataligs on charges of misappropriating public funds and lying to investigating agents.[2] The charges stem

---

[1] Although the Ataligs have the same surname, it does not appear from the record that they are married or closely related. Nonetheless, the Court refers to them jointly for convenience.

[2] The specific counts are: (1) conspiracy in violation of 18 U.S.C. §§ 1343, 666, and 371; (2) wire fraud in violation of 18 U.S.C. §§ 2 and 1343; (3) theft from a program receiving federal funds in violation of 18 U.S.C. §§ 2 and 666(a)(1)(A) and (b); (4) and (5) false statement in violation of 18 U.S.C. § 1001(a)(2). (Superseding Indictment, ECF No. 23 at 5–8.)

from several off-island trips that the Ataligs took in 2018, including to California and Palau. (Superseding Indictment, ECF No. 23 at 5–8.) The government alleges that these trips were personal in nature, and that the Ataligs used their public office to defraud the CNMI government into funding them. (*Id.*)

Trial was originally scheduled for March 10, 2020. (Order Granting Continuance, ECF No. 91.) At the February 12 pretrial conference, the Court ordered the parties to disclose their witness lists by March 3, 2020. (Minute Entry, ECF No. 112 at 1.) On March 6, 2020, three days after the witness-disclosure deadline and four days before trial, the Ataligs filed a motion to amend their witness list to add an expert witness, Dr. Gregory Vecchi. (ECF No. 168.) The motion stated that Dr. Vecchi has 19 years of experience in the FBI and would testify about the interviewing techniques used by the agents who investigated this case. (*Id.* at 2.)

Shortly after receiving the Ataligs' motion, Assistant U.S. Attorney Eric O'Malley sent defense counsel a request under Fed. R. Crim. P. 16(b)(1)(C) for a summary of Dr. Vecchi's intended testimony. (Affidavit of Eric O'Malley, ECF No. 181-2 ¶ 4.) Then on March 8, O'Malley met with the two main investigators in this case—FBI Special Agent Haejun Park and CNMI Office of the Public Auditor Investigator Travis Hurst. (*Id.* ¶ 6.) Because counsel had not responded to O'Malley's discovery request, Agent Park proposed calling Dr. Vecchi directly. (*Id.* ¶¶ 3–4.) With trial less than two days away, O'Malley agreed to the call for the purpose of obtaining information ordinarily given in a Rule 16 expert witness summary—*i.e.*, "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."[3] (*Id.* ¶¶ 3–6.) Agent Park stepped into a corner of the room and successfully called Dr. Vecchi. (*Id.* ¶ 6.) While Agent Park and Dr. Vecchi spoke over the phone, O'Malley continued working with Hurst. (*Id.*)

---

[3] Fed. R. Crim. P. 16(b)(1)(C).

Consequently, O'Malley did not overhear much of the call. (*Id.*) Agent Park eventually hung up and relayed to O'Malley that Dr. Vecchi said he was not formally hired and knew very little about the case. (*Id* at 7.)

For reasons not relevant here, the March 10 trial did not go forward.[4] (Minute Entry, ECF No. 175). Two days later, on March 12, the Ataligs filed their motion to sanction the government for Agent Park's phone call. ("Motion," ECF No. 177.) The Ataligs argue that the government should be sanctioned for what Agent Park said to Dr. Vecchi, as well as the fact that he called Dr. Vecchi without first notifying defense counsel.

## II.    The May 20 Evidentiary Hearing

Three witnesses—Dr. Vecchi, Investigator Hurst, and Agent Park—testified at the hearing. (ECF No. 214-1.) The Court also received affidavits from each witness into evidence. (*Id.*) The affidavits and live testimony largely overlap in content.

### 1.  *Dr. Vecchi's Testimony*

Dr. Vecchi has a Ph.D. in Conflict Analysis and Resolution. (Tr. 5:18–19.)[5] He is a professor of criminal justice at Missouri Western State University and an instructor at the university's law enforcement academy. (Tr. 6:4–9.)  In the latter role, Dr. Vecchi teaches classes to police officers on interview and interrogation, profiling behavioral analysis, deception detection, criminal investigation, hostage and crisis negotiation, and firearms. (Tr. 6: 9–19.) Before joining academia, Dr. Vecchi was an FBI special agent for 17 years, until retiring in 2014. (Tr. 7:21–24.) As an FBI special agent, Dr. Vecchi was deployed to Iraq in 2004 to supervise logistics. (Tr. 7:25–8:8.) While in Iraq, Dr. Vecchi met Agent Park, also deployed as an FBI special agent. (Tr. 10:6–8.) However, the two were on different teams and only interacting socially. (Tr. 10:9–14.) Dr.

---

[4] The trial is now scheduled for August 4, 2020. (Minute Entry, ECF No. 214.)
[5] "Tr." refers to Volume I of the evidentiary hearing transcript (ECF No. 224).

Vecchi left Iraq after three months and did not have any correspondence with Agent Park until the March 7 phone call approximately sixteen years later. (Exhibit D1, ECF No. 186-1.)

On March 5, 2020, the defense team contacted Dr. Vecchi to ask if he would serve as an expert witness in this case. (Tr. 36:19–37:12.) Dr. Vecchi provided his credentials, and the defense gave him a detailed synopsis of the case, including confidential information. (Tr. 37:18–24; 39:17–19; 41:25–42:1.) The defense also provided materials that Dr. Vecchi reviewed while waiting for the Court to approve his fee. (Tr. 46:14–15.) By that point, Dr. Vecchi thought he would probably serve as a defense expert in this case. (Tr. 49:4–10.) And ultimately, his fee was approved. (Tr. 46:9–10.)

Two days after the defense team contacted him, Dr. Vecchi answered Agent Park's call at his home in Deadwood, South Dakota.[6] (Tr. 17:6–12.) The call lasted approximately 9–10 minutes. (Tr. 17:17–18.) Before explaining his reason for calling, Agent Park first identified himself and reminded Dr. Vecchi about their time in Iraq together. (17:19–25.) For the first third of the phone call—about three minutes—the two reminisced about Iraq. (Tr. 18:13–17.) Afterwards, Agent Park pivoted to asking Dr. Vecchi what role he was serving as an expert witness in this case and what he planned to testify about. (Tr. 19:1–21; 58:14–22.). Dr. Vecchi asked Agent Park what his involvement in the case was, and Agent Park answered that he was the case agent. (Tr. 19:1–10.) In Dr. Vecchi's opinion, Agent Park sounded confident and gave the impression that the prosecution had a strong case. (Exhibit D1.)

Dr. Vecchi felt that the initial three minutes spent reminiscing about Iraq was a "pretext" and "obvious ruse" designed to manipulate him into divulging sensitive defense information. (Tr. 22:1–16; 25:5–6.) In Dr. Vecchi's words:

---

[6] Because Saipan is 16 hours ahead of Deadwood, the call happened on two different dates simultaneously. For Dr. Vecchi, it was March 7 at 8:15 p.m., while for Agent Park it was March 8 at 12:15 p.m. (Tr. 17:13–14.)

> [T]rying to build rapport . . . [a]nd then trying to get me to give him information that – what I was going to do for the case. And what – what I was going to testify to. What I was going to do. And that – that's clearly an attempt to divulge sensitive information, because I had sensitive information at the time that – that was given to me, you know, before I got the rest of the information. And that's clearly an attempt, a manipulation, if you will.

(Tr. 20:13–24.) Dr. Vecchi further stated: "you don't go talking to witnesses that are clearly going to be testifying or expected to testify for the defense without permission from the defense." (Tr. 63:12–14.)

Because Dr. Vecchi believed Agent Park was attempting to manipulate him, he decided to "do [to Agent Park] what he was doing to me." (Tr. 52:6–8.) Dr. Vecchi "wasn't going to give [Agent Park] any information on what he previously wanted to know about." (Tr. 60:1–3.) Consequently, Dr. Vecchi lied that he had not reviewed any materials in the case, did not know anything, and was not sure of his involvement. (Tr. 49:13–21; 52:4–8.)

Before ending the call, Agent Park asked Dr. Vecchi whether he knew Jay Wolfe, the defense investigator. (Tr. 21:11–13.) Although Dr. Vecchi knew that Wolfe was part of the defense team, he told Agent park that he "really didn't know Jay [Wolfe] at the time." (Tr. 21:14–16.) Agent Park then told Dr. Vecchi that Wolfe was a problem. (Tr. 26:19–20.) Agent Park elaborated that Wolfe, a former FBI agent, was fired and escorted out of the FBI after an internal investigation found he had character issues and bad work history. (Tr. 26:20–23.) Dr. Vecchi believed that Agent Park was disparaging Wolfe to dissuade Dr. Vecchi from serving as an expert for the defense. (Tr. 22:25–23:12.) Nevertheless, Dr. Vecchi testified that nothing Agent Park said would cause him to alter his expert witness testimony in any way. (Tr. 87:16–25.)

### 2. Travis Hurst's Testimony

Hurst confirmed that he and Agent Park were in the same room during the phone call. (Tr. 99:16–20.) O'Malley was also there for a portion of the call. (Tr. 99:21–22.) From Hurst's

5

understanding, the purpose of the call was to find out what Dr. Vecchi's testimony at trial would be. (126:23–127:2.) While Agent Park spoke to Dr. Vecchi, Hurst and O'Malley worked on trial preparation. (Tr. 104:17–18.) Hurst overheard part of the phone call but was not listening in carefully (Tr. 18–19.) He heard Agent Park tell Dr. Vecchi that Wolfe no longer worked at the FBI and did not leave on his own terms. (Tr. 110:23–25.) However, Hurst could not recall overhearing anything about an internal investigation or Wolfe being escorted out. (Tr. 110:25–111:2.) Hurst was focused on other work with O'Malley, and Agent Park was across the room. (Tr. 111:6–7.)

### 3. Agent Park's testimony

Agent Park maintains that the purpose for the call was to find out what Dr. Vecchi planned to testify about in the Atalig trial. (Tr. 134:3–7.) Agent Park's account of the phone call is largely consistent with Dr. Vecchi's testimony. Park testified that during their 2004 deployments to Iraq, he and Dr. Vecchi lived in the same building and saw each other almost every day. (Tr. 136:11–19.) Sixteen years later, when he saw the Ataligs' motion to add Dr. Vecchi as an expert witness, Agent Park found his phone number on the internet. (139:13–16.) Agent Park was in a conference room with O'Malley and Hurst, and he stepped five to ten feet away to make the call. (Tr. 139:24–140:4.) Before Agent Park revealed himself as the case investigator, he and Dr. Vecchi first reminisced about Iraq for two or three minutes. (Tr. 138:14–23.) Agent Park was trying to confirm his identity to Dr. Vecchi, considering how much time had passed since they last spoke. (141:9–11.) When Agent Park did ask Dr. Vecchi what he would be testifying about, Dr. Vecchi answered, "I have no clue." (Tr. 142:5–7.) Agent Park next asked Dr. Vecchi whether Wolfe, the defense investigator, had contacted him. (Tr. 142:22–23.) Dr. Vecchi responded that he did not know who Wolfe was. (143:1–2.) Agent Park told Dr. Vecchi that Wolfe was a former FBI agent and that he was recently terminated and escorted out of the FBI after an internal investigation. (Tr. 144:6–9.;

146:3–7; 157:12–15.) Agent Park did not believe his statements about Wolfe were disparaging "[b]ecause they're facts." (Tr. 167: 15–22.) Rather, Agent Park felt that what he said about Wolfe was "a professional courtesy" in response to Dr. Vecchi's claim that he did not know who Wolfe was. (Tr. 155:22–156:3; 157:12–15.)

### III.     Legal Standard

District courts have the inherent supervisory power to sanction the government when necessary "to remedy a violation of recognized statutory, procedural, or constitutional rights." *United States v. Woodley*, 9 F.3d 774, 782 (9th Cir. 1993). Even so, "a court may not exercise any supervisory power absent a clear basis in fact and law for doing so." *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985) (internal quotation marks omitted). Separation of powers suggests that any exercise of supervisory power "can be justified only when a recognized right has been violated." *Id.*

### IV.     Discussion

The Ataligs make two arguments in support of their motion for sanctions.[7] First, they claim that it was unlawful for Agent Park to contact Dr. Vecchi without first notifying defense counsel. (Motion at 5–6.) Second, they assert that Agent Park's statements to Dr. Vecchi were an attempt to dissuade him from serving as a defense witness, and that this alone justifies sanctions. (*Id.* at 5–6.) The Court will address each issue in turn.

#### 1.     *Ex parte communication with a defense expert witness*

The Ataligs have not identified any rule or statute that says a member of the prosecution must notify opposing counsel before contacting one of their expert witnesses. The one case the

---

[7] The motion does not specify what sanction the Ataligs are asking for; instead, the motion "would submit the question of what is the appropriate sanction(s) to the Court." (Motion at 8.) However, at the evidentiary hearing, defense counsel requested as a sanction a jury instruction that Agent Park attempted to tamper with a defense witnesses and that this bears on his credibility.

Ataligs rely on, *Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996), is plainly inapplicable. *Erickson* held that a former version of Federal Rules of Civil Procedure 26(b)(4) prohibited an attorney from contacting an opponent's expert witness. *Id.* at 301–03. However, as the opinion itself acknowledges, Rule 26 was subsequently amended to lift this prohibition. *Id.* at 301. Moreover, *Erickson* dealt with only civil procedure. There is no similar prohibition in the rules of criminal procedure. As defense counsel put it at the hearing: "there are no rules saying that you can, nor are there rules saying that you can't." (Tr. 68:10–11.) In other words, the Ataligs argue that the absence of a rule authorizing contact with a defense expert witness is tantamount to a prohibition.

On the contrary, case law indicates that no such prohibition exists. The Ninth Circuit's decision in *United States v. Little*, 753 F.2d 1420 (9th Cir. 1984), is particularly illustrative. In that case, the government learned mid-trial that the defense was planning to call a tax law professor as an expert witness. *Id.* at 1439. Prosecutors were curious about a possible relationship between the professor and one of the defendants, so an IRS special agent called the professor's office and lied to his secretary that an acquaintance had referred him. *Id.* The agent then asked the secretary about the professor's tax law practice and left a number for the professor to call him back. *Id.* When the secretary relayed the message to the professor, he became "chilled by the suspicious phone call because he suspected government involvement." *Id.* By that time the professor had already testified; however, defense counsel decided against calling him to testify on surrebuttal. *Id.* They then filed a motion to dismiss based on witness intimidation. *Id.* The district court denied the motion, finding no government misconduct, and the Ninth Circuit affirmed. *Id.* It specifically held that "there is nothing improper with investigation of trial witnesses. Indeed, such investigations are often necessary to collect information for cross-examination or impeachment purposes. A

telephone call is an appropriate means to conduct such an investigation." *Id.* at 1440.

What happened in this case is analogous. The government learned just four days before trial that the Ataligs intended to call Dr. Vecchi as an expert witness, and the AUSA's immediate request for a Rule 16 summary from defense counsel went unanswered. With the trial about to start, it was reasonable for Agent Park to call Dr. Vecchi and ask what he planned to testify about. That is not privileged information. *See* Fed. R. Crim. P. 16(b)(1)(C).

Nor was it clearly improper for Agent Park to spend the first few minutes of the conversation reminiscing with Dr. Vecchi. Given how much time has passed since the two met in Iraq, there was nothing wrong with exchanging three minutes of pleasantries before turning to the real purpose of the call. If it is not misconduct for the calling agent to lie and conceal his identity, as the Ninth Circuit held in *Little*, then it is surely not misconduct to spend a few minutes building "rapport." Accordingly, the Court does not find any misconduct up to the point when Agent Park brought up Jay Wolfe.

### 2. *Agent Park's comments about Wolfe*

The Ataligs allege that Agent Park's comments about their investigator Wolfe to Dr. Vecchi were an attempt to dissuade Dr. Vecchi from testifying as a defense witness. They argue that this violated the Model Rules of Professional Conduct, which govern attorney behavior in this District. *See* LR 1.5. Model Rule 3.4 states: "A lawyer shall not[] unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act." Model Rules of Prof'l Conduct r. 3.4 (Am. Bar Ass'n 2019). Thus, to establish a violation, the Ataligs must attribute Agent Park's actions to the prosecutor in this case, AUSA O'Malley. They have not done so. Although O'Malley was in the room with Agent Park during

the phone call, there is no evidence that he knew or had reason to suspect Agent Park would tell Dr. Vecchi about Wolfe's termination from the FBI. Consequently, the Court does not find that any government lawyer violated Rule 3.4.

The Court further notes that Agent Park's statements to Dr. Vecchi did not violate any of the Ataligs' due process rights.[8] In cases of alleged witness tampering, "[a] defendant's constitutional rights are implicated only where the [government] employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify." *United States v. Vavages*, 151 F.3d 1185, 1189 (9th Cir. 1998). The two elements of the *Vavages* test are misconduct and substantial interference. *Id.* at 1188. To satisfy the substantial interference prong, a defendant must prove by a preponderance of the evidence that government misconduct either dissuaded a witness from testifying or caused the witness to alter his or her testimony. *United States v. Juan*, 704 F.3d 1137, 1142 (9th Cir. 2013). In other words, no matter how flagrant the misconduct, attempted witness tampering must succeed in order to violate a defendant's constitutional rights. *See Thompson v. Patrick*, No. 1:05CV00141ALAHC, 2008 WL 4532444, at *3 (E.D. Cal. Oct. 8, 2008) (denying a state inmate's § 2254 petition because there was no evidence that the alleged misconduct "had any impact on the substance of the testimony of any defense witness").

At the evidentiary hearing, the Court asked Dr. Vecchi whether any part of his conversation with Agent Park influenced him to alter his expert opinion in any way. (Tr. 87:16–24.) Dr. Vecchi responded without hesitation that it did not. (Tr. 87:22–25.) The record therefore establishes that nothing Agent Park did has substantially interfered with Dr. Vecchi's intended testimony.

In *Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004), the Third Circuit adopted the

---

[8] The Ataligs did not brief the issue of a constitutional violation, but in the interests of justice the Court considers it.

*Vavages* test and applied it to similar facts. Lambert was a state inmate challenging her conviction under 28 U.S.C. § 2254. *Id.* at 218. The weekend before Lambert's trial, the state prosecutor discovered that the defendant's expert witness was someone the district attorney's office had employed in prior cases. *Id.* at 260. Without first notifying Lambert's lawyer, the prosecutor then called the expert witness and expressed frustration that the expert would agree to work for a criminal defendant. *Id.* at 261. When the defense team found out, they filed a motion asking the trial court to somehow sanction the state. *Id.* At a hearing on the sanctions motion, the expert witness testified that the prosecutor had failed to intimidate him and that he would not alter his testimony as a result of the phone call. *Id.* The trial court therefore found that there was no substantial interference, and it did not impose any sanctions on the prosecution. *Id.* After the defendant was convicted, the state appellate court affirmed the judge's decision not to sanction the prosecution for the phone call. *Id.* The appellate court said that although the phone call was "arguably improper conduct" it "did not affect the witness's testimony at trial." *Id.* The Third Circuit concurred, stating:

> To be sure, we do not believe that [the prosecutor's] contact with [the expert witness] was entirely appropriate. At the very least, [the prosecutor] displayed a lack of judgment. Yet not every lapse of prosecutorial judgment violates the Constitution. Here, Lambert had to show that [the prosecutor] substantially interfered with [the expert's] choice to testify. The [state appellate] Court's conclusion that there was not substantial interference was, given the evidence before it, well within the bounds of reason.

*Id.* at 264.

The Court finds *Lambert* persuasive and will follow the same reasoning. In the context of a call to ask what Dr. Vecchi would testify about, Agent Park's comments about Wolfe were a clear lapse of judgment. By speaking confidently about the strength of the prosecution's case and then volunteering derogatory information about the defense investigator, Agent Park did give the impression of trying to dissuade Dr. Vecchi from testifying for the defense. Even so, Agent Park's

statement did not have the slightest influence on Dr. Vecchi, much less a substantial interference. Therefore, he did not violate the Ataligs' constitutional right to due process.

## V.    Conclusion

The Court cannot sanction the government absent proof that a government actor violated a recognized rule, statute, or constitutional right. *Woodley*, 9 F.3d at 782. Here, the Ataligs have not identified any rule or statute that Agent Park breached. And Agent Park's comments about the Ataligs' investigator, though inappropriate, did not cause sufficient prejudice to violate any constitutional rights. Consequently, sanctions are not warranted in this case, and the Ataligs' motion is DENIED.

IT IS SO ORDERED this 2nd day of June, 2020.


RAMONA V. MANGLONA
Chief Judge