F I L E D
Clerk
District Court

JUN 29 2020

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EFRAIM ATALIG and EVELYN ATALIG,<br><br>Defendants. | Case No. 1:18-cr-00013<br><br><br>**MEMORANDUM DECISION DENYING DEFENDANTS' MOTION TO COMPEL IMMUNITY** |

On February 19, 2020, Defendant Efraim Atalig filed a motion to compel use immunity for several witnesses who, on fear of self-incrimination, will otherwise refuse to testify at trial. (Motion, ECF No. 123.) Co-defendant Evelyn Atalig has joined the motion. (ECF No. 120.) With the trial just three weeks away,[1] the Court set the Ataligs'[2] motion on a shortened briefing schedule, followed by a hearing on February 24, 2020. (Order, ECF No. 132.) Ultimately, after considering the parties' written and oral arguments and the governing law, the Court denied the motion at the February 24 hearing. (Minute Entry, ECF No. 140.) The Court now issues this written order memorializing its reasoning.

## I.        Background

Efraim Atalig is the incumbent mayor of Rota, an island municipality within the Commonwealth of the Northern Mariana Islands (CNMI). The Office of the CNMI Attorney General has initiated criminal charges against Mr. Atalig and seven other Rota officials[3] for

---

[1] Trial has since been reset to August 4, 2020.

[2] Although the Ataligs have the same surname, it does not appear from the record that they are married or closely related. Nonetheless, the Court refers to them jointly for convenience.

[3] The individuals are: Dexter Apatang, Vanessa Charfauros, Dean Manglona, Eusebio Manglona, Josepha Manglona, Dennis Mendiola, and Magdalena Mesgnon. (Exhibit A.)

misconduct in public office. (Exhibit A to Motion, ECF No. 123 at 12–15.) The local prosecution arises out of a taxpayer-funded trip to the island of Guam that the Rota officials and other travel companions made in June 2018. (*Id.*) The Rota officials stated that they went to Guam in their role as public servants, intending to shop for government supplies at the Defense Reutilization and Marketing Office (DRMO). The local prosecutors, on the other hand, allege that the excursion was to attend a political rally, and the officials defrauded the CNMI into paying for it. (*Id.*)

On August 30, 2018, the same investigation underpinning the local prosecution led to a federal indictment against Mr. Atalig, though not his local co-defendants. (ECF No. 3.) On November 28, 2020, a superseding indictment added Evelyn Atalig—a target of the original investigation who was never charged locally—as a second federal defendant. (Superseding Indictment, ECF No. 24.) In summary, seven individuals are charged in the local case only; one person (Evelyn Atalig) is charged in this federal case only; and one person (Efraim Atalig) is charged in both.

The federal indictment includes the same accusations about the Ataligs' motivation for visiting Guam in June 2018. (Superseding Indictment at 45.) The indictment additionally accuses the Ataligs of using their public-sector jobs to fraudulently take at least four other personal trips in 2018, including to Palau and California.[4] (*Id.* at 2–5.)

It is uncontested that the Ataligs applied for and received funding from the CNMI government to take these trips. The main issue for trial, it appears, is whether the Ataligs committed a fraud. There are several ways the Ataligs might frame their defense. They could argue, for example, that the trips served a public purpose; that they believed the trips would serve a public

---

[4] The charged counts are, for each defendant: (1) conspiracy in violation of 18 U.S.C. §§ 1343, 666, and 371; (2) wire fraud in violation of 18 U.S.C. §§ 2 and 1343; (3) theft from a program receiving federal funds in violation of 18 U.S.C. §§ 2 and 666(a)(1)(A) and (b); (4) and (5) false statement in violation of 18 U.S.C. § 1001(a)(2). (Superseding Indictment at 5–8.)

purpose; or that the funding applications did not disclose a public purpose, in which case the CNMI government was at fault for approving them.

To help build this defense, the Ataligs intend on calling Mr. Atalig's seven co-defendants from the local case to testify at the federal trial. (Motion, ECF No. 123 at 2.) Among other things, the local defendants will allegedly testify that the Rota group indeed traveled to Guam to visit the DRMO. (*Id.* at 4.) In this version of the facts, the same entire group only went to the political rally because the DRMO arrangements fell through, at which point they were already on Guam and had no more official business to do there. (*Id.*)

Unfortunately for the Ataligs, the local defendants warned that, if called to testify, each will assert a Fifth Amendment right to silence. (*Id.* at 2.) The local defendants' intended silence is understandable. Although the seven have avoided federal indictment, they apparently owe this to prosecutorial discretion. At the February 24 hearing, the Assistant U.S. Attorney (AUSA) stated that the federal indictment was reserved for the two "ringleaders" and opined that local charges would suffice for the others involved. The United States has offered not to prosecute any of the seven who accepted responsibility in the local case and cooperated in the federal case by testifying "honestly." (Motion at 31.) Even so, the local defendants are far from the free and clear. Four of the seven are still awaiting trial in CNMI Superior Court,[5] and none can consummate the federal immunity deal until the Ataligs' trial concludes. Thus, depending on what the local defendants know, they may be unable to testify truthfully without also incriminating themselves both locally and federally.

Feeling in a bind, the Ataligs asked the AUSA to agree to grant the local defendants use immunity to testify as defense witnesses in the federal trial. (Exhibit G to Motion, ECF No. 123 at

---

[5] Of the remaining three, two entered diversion agreements and one pled guilty. (Exhibit G to Motion, ECF No. 123 at 31.)

30.) The AUSA declined, noting "it seems we will have to litigate this issue." (*Id.* at 28.) Consequently, Efraim Atalig filed complementary motions in the CNMI Superior Court and in this Court to compel either the CNMI or the United States to grant the local defendants use immunity to testify for the Ataligs' at trial. Only the federal motion is the subject of this decision, and the Court expresses no opinion on the motion in Superior Court.

## II.     Legal Standard

Both a prosecutor and defendant enjoy the right to subpoena reluctant witnesses to testify at trial. *See* Fed. R. Crim. P. 17. Even so, a subpoena's "power to compel testimony is not absolute." *Kastigar v. United States*, 406 U.S. 441, 444 (1972). "There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination." *Id.*[6] This privilege allows a subpoenaed witness to refuse to answer any question when the witness reasonably believes that a truthful response might expose him or her to criminal liability. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). A reasonable belief requires only a "possibility of prosecution" and includes "those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence." *Id.* (internal quotation marks omitted).

When a witness properly invokes a Fifth Amendment right to silence, the defendant cannot override it. The prosecution, on the other hand, can, provided it "pay a price." *United States v. Balsys*, 524 U.S. 666, 692 (1998). That price is simple: the prosecutor must eliminate any possibility that the compelled testimony will expose the witness to criminal liability. *Id.*[7] To do this, the prosecutor gives the silent witness either "use" or "transactional" immunity. *New Jersey*

---

[6] The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[7] "[W]hen a witness's response will raise no fear of criminal penalty, there is no protection for testimonial privacy at all." *Balsys*, 524 U.S. at 692.

*v. Portash*, 440 U.S. 450, 457 (1979). Use immunity renders the compelled testimony and its fruits inadmissible in any state or federal prosecution against the witness. *Balsys*, 524 U.S. at 682; *United States v. Lord*, 711 F.2d 887, 890 (9th Cir. 1983). Transactional immunity is even broader. The immunizing jurisdiction can never prosecute the witness "for any offense to which the testimony relates," *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991); moreover, the witness automatically receives use immunity in every other jurisdiction, *United States v. Biaggi*, 675 F. Supp. 790, 806 (S.D.N.Y. 1987).

Countless defendants have undoubtedly decried the prosecution's unshared power to overcome a witness's invocation of silence. Importantly though, while this ability at times gives the prosecutor an extra card to play, there is a mechanism to level the playing field when necessary. Courts will themselves compel a silent witness to testify, with the effect of bestowing use immunity, if the alternative deprives a defendant of a fundamentally fair trial. *United States v. Straub*, 538 F.3d 1147, 1162 (9th Cir. 2008). In *Straub*, the Ninth Circuit articulated a two-prong analysis for a court to decide whether to compel use immunity over the prosecutor's objection. *Id.* The first prong asks whether the witness's intended testimony is relevant. *Id.* The second prong is divided into two sub-prongs: a "purpose" and "effects" test. *Id.* at 1158. The purpose test asks whether the prosecutor, with the purpose of distorting the fact-finding process, intentionally caused a defense witness to refuse to testify without use immunity. *Id.* at 1162. The effects test, by contrast, asks whether the prosecutor selectively denied use immunity to defense witnesses, while granting it to government witnesses, with the effect of distorting the fact-finding process. *Id.* A defendant has the option of satisfying either test. *Id.* at 1159.

/

//

### III.    Discussion

*1. Relevance*

Under the first *Straub* prong, the Court must determine whether the local defendants' testimony will be relevant. *Straub*, 538 F.3d at 1157. The standard for relevance here is "minimal." *Id.* "The defendant 'need not show that the testimony sought was either clearly exculpatory or essential to the defense.'" *Id.* (quoting *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991)). It suffices, for example, to raise "credibility questions about a key prosecution witness." *Id.* In this case, the Ataligs expect the local defendants, if compelled, to testify that the Rota group went to Guam to visit the DRMO. If this is the local defendants' intended testimony, it might[8] negate the prosecution's claim that the Ataligs lied on their applications for travel funding. Therefore, this hypothetical testimony, if found to be true, is both relevant and exculpatory.[9]

As to the second *Straub* prong, the Ataligs assert that they have satisfied this prong under both the purpose and effects test. The Court will address each in turn.

*2. The Purpose Test*

To satisfy the purpose test, the Ataligs must prove that "the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process." *Straub*, 538 F.3d at 1162. Resolution "turns on whether the prosecution took affirmative steps to prevent [a defense witness] from testifying." *Williams v. Woodford*, 384 F.3d 567, 601 (9th Cir. 2004). The quintessential scenario is "when the prosecution intimidates or harasses the witness to discourage the witness from testifying, for

---

[8] It is not the Court's prerogative to decide which witnesses are credible. That duty will fall solely on the jury.

[9] As the Court will explain, the Ataligs' motion fails the next prong of the *Straub* test. Therefore, it is unnecessary to determine whether the Ataligs' prediction of the local defendants' testimony is accurate. If, however, the motion did pass the second prong, the Court would still have to interview the local defendants *in camera* to confirm the Ataligs' prediction. *Straub*, 538 F.3d at 1151.

example, by threatening the witness with prosecution for perjury or other offenses." *Id.*

The Ataligs make two principle claims to support their theory that the AUSA attempted to stop the local defendants from testifying as defense witnesses. First, the Ataligs assert that the AUSA is hanging the threat of federal charges over the local defendants' heads to ensure that they invoke a right to silence at trial. (Motion at 9.) Second, the Ataligs accuse the AUSA of taking unofficial control over the local prosecution to ensure that its defendants will not testify for the Ataligs at the federal trial. (*Id.* at 10.)

### a.  Threatening federal charges

The Ataligs contend that the United States' offer not to prosecute the local defendants if they accept responsibility and testify truthfully was a tacit threat that the United States will prosecute them if their testimony is exculpatory. (*Id.*) The Court disagrees with this characterization. At the hearing, the AUSA explained that the condition to testify truthfully was merely a caution not to commit perjury, a duty that every witness has. The AUSA further stated that the local defendants will not *per se* void the immunity deal by giving exculpatory testimony. Only perjured testimony, whether exculpatory or not, will void the immunity deal. Given these assurances, the Court does not find that the AUSA harassed the local defendants into not testifying. Indeed, other than the right against self-incrimination—and a few other narrow privileges—a witness has no lawful discretion to decide who to testify for or what information to give.

### b.  Interfering in the local case

The Ataligs identify two ways in which they believe the AUSA interfered in the local case to prevent those defendants from testifying at the federal trial. First, they point out that the Superior Court has repeatedly rescheduled the local trial in lockstep with continuances of the federal trial, setting the local trial to begin just after the federal trial. The Ataligs attribute this to a concerted

effort by the AUSA, in collaboration with the local prosecutor, to guarantee that the local defendants' charges are still pending when the Ataligs call them to the stand in the federal trial. Otherwise, the local defendants might no longer fear criminal liability from their testimony if the local case was already resolved. However, by his own admission, Efraim Atalig himself moved for at least some of the continuances in Superior Court. Therefore, the Court cannot blame the local prosecutor or the United States for all these delays.

Next, the Ataligs accuse the AUSA of instructing the local prosecutor to oppose the analogous immunity motion filed in Superior Court, in order to stop the CNMI from granting the local defendants use immunity to testify at the federal trial. To back this claim, the Ataligs included with their motion an email exchange involving their lawyers, the local prosecutor, and the AUSA. (Exhibits E and G, ECF No. 123 at 22–24, 28–32.) The emails, taken in isolation, do appear to back some of the Ataligs' allegations. For example, when Efraim Atalig's lawyer asked the local prosecutor whether the CNMI government would oppose granting the local defendants use immunity, the local prosecutor responded, "I think the most appropriate person for this conversation is [the AUSA]." (*Id.* at 22.) Moreover, when Efraim Atalig's lawyer later asked the local prosecutor to agree to an expedited schedule on the immunity motion filed in Superior Court, the AUSA was the one to respond, writing "Sure." (*Id.*) Thus, the emails can support an inference that the AUSA was instructing to the local prosecutor not to grant the local defendants use immunity.

In the end, however, the Court is satisfied with the AUSA's explanation for the emails. According to the AUSA, his association with the local prosecutor is a "partnership," and he never instructed her not to grant the local defendants use immunity. The AUSA further stated that he only involved himself in the email conversation because he and the local prosecutor thought Mr.

Atalig was inquiring about the federal immunity motion too. The Court accepts this account and does not find that the AUSA endeavored to prevent the CNMI government from granting the local defendants use immunity. Accordingly, the Ataligs have failed to satisfy the purpose test.

### 3. The Effects Test

To satisfy the effects test, the Ataligs must prove that "the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial." *Straub*, 538 F.3d at 1162. This test prohibits the prosecution from selectively granting use immunity to only its witnesses in order to "stack the deck." *Id.* at 1160. However, by its terms the test does not apply in situations where the prosecution itself forgoes calling any immunized witnesses. *See United States v. Flores-Blanco*, 623 F.3d 912, 917–18 (9th Cir. 2010) (finding that the district court properly denied a motion to compel use immunity under the effects test because "there were no immunized government witnesses").

In their motion, the Ataligs portray the United States' immunity offer to the local defendants as a selective grant of use immunity. The Ataligs argue that the United States will not honor the immunity deal for any local defendant who testifies that the purpose of the Guam trip was to attend the DRMO because it will deem that testimony untruthful. Conversely, the United States will allegedly honor the immunity offer for any local defendant who testifies that the trip was to attend the political rally, as that testimony will be "truthful."

The Ataligs' argument fails for two reasons. As already mentioned, the AUSA indicated at the hearing that the United States will still honor its immunity offer for any local defendant who testifies for the defense, unless there is clear evidence of perjury. Thus, the Ataligs cannot

accurately characterize the immunity offer as a selective grant of immunity, because it may well apply to a witness who testifies for only the Ataligs. But more importantly, the AUSA also stated at the hearing that, while the Ataligs are still free to call the local defendants to testify, the United States will not do so. In other words, the government's case in chief will not include any immunized government witnesses. Without that key element, the Ataligs' motion also fails the effects test. Consequently, the Ataligs cannot prevail on the second *Straub* prong.

### IV.    Conclusion

For the foregoing reasons, the Ataligs' motion to compel use immunity is DENIED.

DATED this 29th day of June, 2020.

RAMONA V. MANGLONA
Chief Judge