F I L E D
Clerk
District Court

AUG 31 2020

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EFRAIM ATALIG and EVELYN ATALIG,<br><br>Defendants. | Case No. 1:18-cr-00013<br><br>**MEMORANDUM DECISION GRANTING DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 3** |

## I. Introduction

Defendants Efraim and Evelyn Atalig went to trial on a five-count superseding indictment beginning on August 11, 2020. The prosecution presented its case-in-chief over three days of testimony starting August 14. When the prosecution rested on August 18, the Ataligs jointly moved for a judgment of acquittal on all counts, and the Mayor provided a pocket brief as to the motion pertaining to Count 3, theft from a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). (ECF No. 344.) The next day, the Court orally granted in part on the record the Ataligs' motion, and entered a judgment of acquittal on Count 3. As the Court stated, there was insufficient evidence for any rational jury to find the Ataligs guilty of that charge. The Court now issues this written decision to memorialize its reasoning.

## II. Background

During trial, the prosecution established the following undisputed facts. The Ataligs—described by all sides as "common law spouses"—are both public servants on Rota, one of the

three main islands in the Commonwealth of the Northern Mariana Islands (CNMI). Efraim is the island's mayor, and Evelyn works as Assistant for Women's Affairs in the Office of the Mayor. Throughout 2018, while the Ataligs held their government positions, both used public funds to take multiple off-island trips, including to Guam, Saipan, Palau, and California. The Ataligs maintained that every trip was work-related and served the interests of Rota. The prosecution, on the other hand, alleged that five of these trips were for various personal agendas. For example, while the Ataligs declared that they went to Palau to promote tourism on Rota, the prosecution claimed it was for personal reasons, a honeymoon. Similarly, the official reason for the June Guam trip was to shop for government surplus supplies, but the prosecution contended that the Ataligs' actual motivation was to attend a political rally. During trial, the prosecution portrayed the Ataligs as fabricating official pretexts for their trips in order to defraud the local government into covering the travel costs and paying their per diems.

Relevant here, Count 3[1] charged the Ataligs with theft from a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). (Superseding Indictment ¶ 28, ECF No. 23.) Section 666 is an anti-corruption law designed to "safeguard finite federal resources" against acts of embezzlement or bribery by the very officials entrusted "with control of [those] funds." *United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994). To convict a defendant of embezzlement under this statute, a prosecutor must prove two things. First, that the defendant, being an agent of any organization, or of a State or local government, or any agency thereof, embezzled at least $5,000 from that organization. § 666(a)(1). Second—the jurisdictional element—that this same organization, government, or agency "receive[d], in any one year period, benefits in excess of

---

[1] The other charged offenses were one count of criminal conspiracy, one count of wire fraud, and two counts of making a false statement to an FBI agent. (Superseding Indictment ¶¶ 23–32, ECF No. 24.) As to these charges, the Court denied the Ataligs' motion for a judgment of acquittal and submitted the question of guilt to the jury. In the end, the jury acquitted the Ataligs on all counts. (Jury Verdict, ECF No. 370.)

2

$10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b).

### III.  Judgment of Acquittal Standard

Ordinarily, it is the exclusive purview of the jury to convict or acquit a criminal defendant. However, before the Court can entrust this authority to the jury, the prosecution must first present enough evidence at trial that a conviction is conceivably possible. "Under that standard, evidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational [jury] to find the essential elements of the crime beyond a reasonable doubt." *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998). Conversely, if the government rests before presenting enough evidence to prove every essential element of a charged offense, then the Court must as a matter of law grant a judgment of acquittal. Fed. R. Crim. P. 29(a). This standard is extremely deferential to the prosecution and jury. Indeed, a court may only grant a judgment of acquittal if there is insufficient evidence for any rational juror to convict a defendant. *United States v. Johnson*, 874 F.3d 1078, 1079 (9th Cir. 2017). In making that assessment, the Court "is not to weigh conflicting evidence or consider the credibility of witnesses." *United States v. Lester*, 749 F.2d 1288, 1296 (9th Cir. 1984).

### IV.  Discussion

Section 666(a)(1) specifically criminalizes embezzlement, not theft in general. Moreover, the statute only applies where federal funds are concerned. Consequently, to prevail at trial, the prosecution had to prove two threshold facts beyond a reasonable doubt: (1) that the Ataligs were agents of a distinct government, and (2) that this government received over $10,000 in federal benefits. § 666. If the prosecution fails to prove either, then it no longer matters how much evidence there was of an actual theft. It does not become a federal offense.

*1. The Ataligs are agents of the municipal government of Rota.*

The alleged fraud in this case centered on the Ataligs' official positions in the Rota Mayor's office. The prosecution argued its case assuming that, for purposes of § 666(a)(1), any public official on Rota is an agent of the CNMI's central government. That assumption, however, was incorrect.

Section 666 defines "agent" as "a person authorized to act on behalf of another person or a government." § 666(d)(1). "Government," in turn, means any "State[2], local, or Indian tribal government, or any agency thereof." § 666(a)(1). Because the statute explicitly distinguishes between state and local governments, courts have recognized that most municipal officials are not agents of their state's central government. Rather, they are agents of the local government. *See United States v. Kranovich*, 401 F.3d 1107, 1113 (9th Cir. 2005) (elected sheriff was an agent of the county government). The only exception is when state law categorizes a local official as an agent of the entire state. *United States v. Langston*, 590 F.3d 1226, 1233–34 (11th Cir. 2009).

Each of the CNMI's three major islands—Saipan, Tinian, and Rota—is a political subdivision with a locally-elected mayor. N.M.I. Const. art. VI. Essentially, the islands are analogous to city-counties. There is a separate central government for the CNMI as a whole, complete with at-large elections. N.M.I. Const. art. III. Given this set up, the Court has previously held that the islands' local mayors are not agents of the CNMI's central government. *United States v. Borja*, No. CV-02-0016-ARM, 2003 WL 23009006, at *4 (D. N. Mar. I. Dec. 12, 2003) ("a mayor is not a member or agent of the executive branch such that an exercise of its powers and duties will necessarily bind the CNMI"). Instead, the mayors are local officials with strictly local powers. *Id.* That rule is decisive here. Efraim Atalig, being the mayor of Rota, is an agent of only

---

[2] The definition of "State" includes the CNMI. § 666(d)(4).

4

the island's municipal government. The same must be said of Evelyn Atalig, who was serving in the Mayor's Office. Therefore, to prove that the Ataligs violated § 666(a)(1), the prosecution had to offer evidence of Rota's municipal government receiving over $10,000 in federal benefits within one year of the alleged embezzlement.

   2. *There is no evidence of Rota receiving any sum of federal benefits.*

To prove this jurisdictional element, the prosecution called one witness: CNMI Treasurer Asuncion Agulto. Agulto testified as follows. All government revenue in the CNMI, whether from taxes or federal grants, is pooled into a single general fund. There is no effort to segregate the revenue by point of origin. Instead, everything is simply mixed together. The central government then withdraws from this general fund to cover its expenses. In 2018, the central government received over $15,000 from a federal grant for its public library on Saipan, the Joeten Kiyu Public Library. (Government's Ex. 139.) This grant, like everything else, initially went into the general fund. Also in 2018, the central government transferred portions of the general fund to Rota's municipal government. This amount—called the "Imprest Fund"—was to cover the municipality's local budget. The Mayor's Office had total authority over the Imprest Fund, without any oversight from the central government. The five trips at the center of this controversy were all paid for out of the Imprest Fund.

And that was the entirety of Agulto's testimony. The issue for the Court, therefore, is this: accepting everything Agulto said as true, is it evidence of Rota's local government receiving over $10,000 in federal benefits in 2018? The most striking aspect about this testimony is what it lacks. Agulto did not suggest that Rota's government ever receives direct transfers from the federal government. On the contrary, to the extent that Rota has received federal dollars, it appears that they first passed through the CNMI's central government as an intermediary. Moreover, Agulto

did not identify a single federal benefit, other than the library grant, that the CNMI has received. Nor did she say whether a portion of this library grant went to Rota. Nor is there any reason to assume that it did, considering that the library is on a different island.

The Supreme Court has addressed the jurisdictional element of § 666 three times. First, in *Salinas v. United States*, the Court held that the statute's bribery prohibition was not limited to bribes directly influencing the expenditure of federal funds. 522 U.S. 52, 61 (1997). On the other hand, *Salinas* declined to consider whether § 666 required some lesser connection between a bribe or theft and the federal funds at stake. *Id.* at 59. The Court did, however, take on this issue seven years later in *Sabri v. United States*, 541 U.S. 600 (2004). *Sabri* held that § 666 does not require any nexus between an organization's use of federal funds and a charged act of theft or bribery within that organization. "Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there." *Id.* at 606. Therefore, the statute prohibits embezzlement even of funds wholly unrelated to the federal benefits received. *Id.* at 607.

Lastly, in *Fischer v. United States*, 529 U.S. 667 (2000), the Court answered the separate question of what qualifies as a federal "benefit" within the meaning of the bribery statute at 18 U.S.C. § 666(a)(1)(B). Specifically, the Court had to decide whether Medicare payments to a healthcare provider constitutes a benefit to that provider. As the Court explained, "[a]ny receipt of federal funds can, at some level of generality, be characterized as a benefit. The statute does not employ this broad, almost limitless use of the term. Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance." *Id.* at 681. Thus, compensation that the federal government pays out as part of an ordinary business transaction is

6

not a "benefit" under the statute. *Id.* at 678. "For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime." *Id.* at 679 (quoting S. Rep. No. 98-225, p. 370 (1984)). "To determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose." *Id.* at 681.

As to Medicare, the defendant argued that the only beneficiaries of this program are the qualifying patients, as opposed to the treating hospitals. *Id.* at 670. The Supreme Court, however, rejected that narrow view. Medicare payments, the Court noted, "are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." *Id.* at 679–80. Accordingly, while qualifying patients are undoubtedly beneficiaries of Medicaid, so too are participating hospitals. *Id.* at 681.

Importantly though, both *Fischer* and *Sabri* left unanswered the central question in this case: under what circumstances is a local government's receipt of funding from a central government an indirect federal benefit? To the Court's knowledge, the Ninth Circuit has never squarely addressed this issue. Its most on-point case is an unpublished disposition holding, without elaboration, that a heath clinic's receipt of federal "pass-through grants" from a central tribal government was an indirect federal benefit. *United States v. Morsette*, 653 F. App'x 499, 501 (9th Cir. 2016). However, the Ninth Circuit has not explained how to determine when federal funding passes through a state government to its subdivisions. There is, fortunately, a persuasive body of case law outside the Ninth Circuit.

The first appellate court to touch on this issue was, aptly enough, the First Circuit. The

relevant facts of that case, *United States v. Dubon-Otero*, 292 F.3d 1 (1st Cir. 2001), were as follows. A federal agency awarded the Puerto Rican government a grant to assist AIDS patients in Puerto Rico. *Id.* at 8. The Puerto Rican government then transferred a portion of this grant to the municipal government of San Juan. *Id.* The municipality, in turn, paid over $10,000 to a private healthcare corporation for the care of local AIDS patients. *Id.* at 4. The issue on appeal was whether the corporation was itself a federal grant recipient for purposes of § 666. The First Circuit held that it was. *Id.* at 8–9. The court reasoned that the movement of federal funds through several intermediaries did not break the statute's jurisdictional hook of federal benefits. *Id.* However, in reaching this conclusion, the court relied on the fact that the corporation ultimately received the funds in furtherance of the grant's original mission: helping AIDS victims. *Id.* Therefore, the payment to the corporation furthered the grant's "structure, operation, and purpose." *Id.* at 7–9.

The following year, the Fifth Circuit decided *United States v. Jackson*, 313 F.3d 231, 233 (5th Cir. 2002). The defendant was charged under § 666 as an agent of the Monroe, Louisiana city government. *Id.* at 233. To the prove the jurisdictional element, the prosecution relied on testimony that the city was an indirect recipient of a federal grant passing through the state government. *Id.* at 235. The testimony was that that the National Endowment for the Humanities (NEH) paid a federal grant to the Northeast Louisiana Arts Council (NELAC). *Id.* at 234–35. NELAC later paid the city government $10,090 to help fund a local folk festival. *Id.* On appeal, the Fifth Circuit reversed the defendants' convictions due to insufficient evidence. One reason was because the prosecution did not attempt to prove that over $10,000 of NELAC's payment to the city originated from the NEH grant. *Id.* at 235. If more than $89 came from other sources mixed in with the NEH grant, then the city would not have received over $10,000 from the federal government. *Id.*

Lastly came the Eleventh Circuit's decision in *United States v. McLean*, 802 F.3d 1228

(11th Cir. 2015). In that case, the defendant was a city commissioner and a board member of a city redevelopment agency called MCRA. *Id.* at 1232. "The evidence in the record that the MCRA received federal benefits was twofold: 1) the City received federal funds and the City in turn provided funding to the MCRA; and 2) Broward County used federal stimulus funds to construct six bus shelters, which were placed in the continued care of the MCRA." *Id.* at 1243. The Eleventh Circuit ultimately held that this was insufficient evidence of MCRA being an indirect recipient of federal benefits. "[I]ndirect receipt of funds qualifies as a benefit only if the government can show a relationship between the structure, operation, and purpose of the federal scheme authorizing the distribution of funds and their ultimate use at the relevant local level." *Id.* at 1244 (internal quotation marks omitted). And "absent from the government's proof was any evidence identifying the relationship between the program authorizing a disbursement of federal funds [to the city and county] and the ultimate use of those funds [by MCRA]." *Id.*

Reading these cases together with *Fischer* establishes a clear rule: Evidence that a local government received federal funds through an intermediary can be used to prove that the local government was an indirect recipient of federal benefits. However, to satisfy the jurisdictional element this way, the prosecution must further prove two things. First, that over $10,000 transferred to the local government is traceable back to the federal source. Second, that the expenditure of those funds at the local level relates to the "structure, operation, and purpose" of the original federal grant.

In this case, the prosecution proved neither fact. There is no evidence that over $10,000 from the federal library grant went into Rota's Imprest Fund. Nor is there any evidence that the Rota Mayor's expenditure of its Imprest Fund related to the structure, operation, and purpose of the library grant. The fact that the library grant dissolved into the general fund does not transform

9

every recipient of the general fund into an indirect beneficiary of the grant.

If the Municipality of Rota did receive over $10,000 in federal benefits in 2018, it was the prosecution's burden to present evidence of this at trial, and that did not happen. As a result, there was insufficient evidence to prove the jurisdictional element of Count 3. And without proof of the jurisdictional element, it was impossible for the jury to convict the Ataligs of that offense.

## V.     Conclusion

For the foregoing reasons, the Court GRANTED the Ataligs' motion for a judgment of acquittal on Count 3 of the superseding indictment.

DATED this 31st day of August, 2020.

                                                              RAMONA V. MANGLONA
                                                              Chief Judge